UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                            Crim. Action No. 5:13-cr-34

Karen Brisson

## <u>REPORT AND RECOMMENDATION</u>
(Doc. 17)

Defendant Karen Brisson, proceeding *pro se*, has filed a Motion Under 28 U.S.C.

§ 2255 to Vacate, Set Aside, or Correct a Sentence.  (Doc. 17.)  Brisson pleaded guilty to

one count of federal-program embezzlement in violation of 18 U.S.C. § 666(a)(1)(A).

(Doc. 4.)  On July 18, 2013 Chief United States District Court Judge Christina Reiss

sentenced Brisson to a term of imprisonment of 24 months.  (Doc. 14.)  Brisson was also

ordered to pay restitution in the amount of $431,812.06.  (*Id.*)  Attorney Devin

McLaughlin represented Brisson throughout the underlying proceedings.  Brisson did not

pursue a direct appeal.

In her Motion, Brisson asserts that she was sentenced "based on factual errors."

(Doc. 17-2 at 1.)  The government filed an opposition, arguing that Brisson's Motion is

procedurally barred, that she cannot establish any constitutional infirmity in her sentence,

and that any ineffective-assistance-of-counsel claim is meritless.  (Doc. 19.)  In a Reply,

Brisson insists that she is entitled to relief, and requests a hearing.  (Doc. 20 at 2–3.)  In a

Supplemental Memorandum, she contends that she received ineffective assistance of

counsel at her sentencing.  (Doc. 23.)  In response to the court's Order (Doc. 24),

Attorney McLaughlin has filed an affidavit responding to Brisson's allegations of

ineffectiveness (Doc. 25).  The parties have filed supplemental memorandums in

response to Attorney McLaughlin's affidavit.  (Docs. 26, 27.)

    For the reasons set forth below, I recommend that Brisson's Motion (Doc. 17) be

DENIED.

## Background

### I.    Information, Plea Agreement, and Guilty Plea

    In an Information dated and filed March 18, 2013, the government alleged that

between 2006 and approximately November 2012, Brisson—while serving as the Town

Clerk for the Town of Weybridge, Vermont—embezzled hundreds of thousands of

dollars from the Town.  (Doc. 1 at 1.)  Alleging that the Town was "a municipality which

in a one-year period between 2006 and December 31, 2012 received more than $10,000

under federal programs involving loans, grants, subsidies and other forms of Federal

assistance," the government charged Brisson with violating 18 U.S.C. § 666(a)(1)(A).

(*Id.* at 2.)  Also on March 18, 2013, the parties filed an executed Plea Agreement.  (Doc.

2.)  At a hearing held on March 25, 2013, Brisson appeared with Attorney McLaughlin

and pleaded guilty to the charge in the Information.  (Doc. 4.)  The court accepted the

guilty plea and ordered a presentence report (PSR).  (*Id.*)  A sentencing hearing was

scheduled for July 18, 2013.  (Doc. 7.)

## II.     The PSR's Chronology of Events

Prior to sentencing, the United States Probation Office submitted a PSR to the court, recommending that the Sentencing Guideline range of imprisonment was 24 to 30 months, based on a total offense level of 17 and a Criminal History Category of I.  (PSR ¶ 63.)  The PSR included a lengthy narrative outlining Brisson's offense conduct.  (*Id.* at ¶¶ 5–18.)  It is necessary to understand the PSR's chronology of events, both because the court ultimately adopted that chronology as its findings of fact (see *infra*), and because Brisson now alleges factual errors in the PSR.  The relevant chronology of events outlined in the PSR can be summarized as follows; the factual errors that Brisson asserts are identified in footnotes.

In 1986 Brisson began her service as the Weybridge Town Clerk and Town Treasurer.  (PSR ¶ 6.)  "In the spring of 2012, in response to recent articles in the Burlington Free Press related to embezzlement, one of the selectboard members began contemplating an audit of the town's accounts."  (*Id.*)[1]  "The matter was addressed at the May 2012 board meeting but was tabled by the board."  (PSR ¶ 6.)[2]  In late August 2012, the Vermont League of Cities and Towns (VLCT) began recommending that Vermont towns conduct external audits.  (PSR ¶ 7.)  "This recommendation was discussed at a

---

[1]  Brisson asserts that this occurred in the winter of 2012 (not the spring).  (Doc. 20 at 8.)

[2]  Brisson says that the meeting at issue occurred in March (not May) 2012.  (Doc. 20 at 8–9.)

board meeting and Karen Brisson, who attended these meetings and took minutes a[t] these meetings, presented herself as being in support of an audit."  (*Id.*)[3]

On September 4, 2012, Brisson completed her last embezzlement from the Town by issuing herself a check in the amount of $3,281.90.  (PSR ¶ 15d.)  In "early September" 2012, two Selectboard members discussed a complaint that Brisson had taken between $8,000 and $9,000 from the Town.  (*Id.* at ¶ 8.)[4]  "One of the board members advised Brisson of the allegation the Monday following the initial discussion of the alleged theft."  (*Id.*)[5]  Brisson appeared surprised and shocked, but said she was willing to cooperate.  (PSR ¶ 8.)

At its next meeting, the Selectboard decided to proceed with an external audit "to protect both the town and Brisson."  (*Id.* at ¶ 9.)  The day after the meeting, a Selectboard member advised Brisson of the decision to conduct an audit, and also informed her that she had the Selectboard's support.  (*Id.*)  In response, Brisson "appeared to be in total agreement while at the same time angry and interested in finding out who made the allegation of theft."  (*Id.*)

---

[3]  The PSR does not explicitly state when the Selectboard's discussion regarding the VLCT's recommendation took place.  Brisson asserts that the Selectboard's discussion of the recommendation did not occur in August.  In one filing she says that the discussion was in October (Doc. 20 at 8), but later in that filing she indicates that it was in mid-September (*id.* at 9).  In a later filing she says that she is "100% sure" that it was September.  (Doc. 27 at 4.)

[4]  The PSR's chronology does not make it clear whether the Selectboard members' "early September" discussion and their subsequent discussion with Brisson occurred before or after her final embezzlement on September 4, 2012.  Brisson insists that "[t]he last check of September 4th was written a few days before I was approached by a Board Member and any indication at all of theft."  (Doc. 17-3 at 1–2.)

[5]  Brisson says that she was not advised of the alleged theft on "Monday," but instead on "the Friday [September 7] before the meeting of [Tuesday] September 11."  (Doc. 20 at 8; *see also id.* at 9.)

A meeting with an accountant took place during the week of November 5, 2012, attended by Brisson and a Selectboard member.  (*See id.* at ¶¶ 10–13.)  At the meeting "Brisson appeared to act differently."  (*Id.* at ¶ 11.)  According to the Selectboard member who attended, Brisson—who was always well organized—informed the accountant that "her books were a mess and that she didn't have a good system in place." (*Id.*)  Also, Brisson left the meeting after only about fifteen minutes "because she had to leave to pick up her daughter."  (*Id.*)

On Friday November 9, 2012, a Selectboard member received a call from the Law Office of Peter Langrock advising that they had "a matter of town business to discuss" and asking Selectboard members to come to Langrock's office the following Monday. (*Id.* at ¶ 12.)  On Monday November 12, 2012, the Selectboard met with Attorneys Peter Langrock and Devin McLaughlin.  (*Id.* at ¶ 13.)  During the meeting, Langrock informed the Selectboard that his firm represented Brisson, and provided the board with a letter from Brisson admitting that over the past several years she took money from various Town accounts.  (*Id.* at ¶¶ 13, 13a)  In the letter, Brisson stated that she was prepared to resign and that she "had decided to bring this forward some time ago, but . . . felt it important to the Town to complete the [November 6, 2012] election before doing so." (*Id.* at ¶ 13b.)

Attorney Langrock drafted a letter informing the Addison County State's Attorney of Brisson's embezzlement.  (*Id.* at ¶ 14.)  An investigation commenced, and Brisson gave interviews to a Vermont State Police detective on November 28, 2012 and March 1,

2013.  (*Id.* at ¶¶ 15–16.)  The Information charging Brisson with embezzlement was filed

on March 18, 2013.  (*Id.* at ¶ 1.)

In addition to the above chronology of events, the PSR quoted a letter from the

Town of Weybridge that the Town had provided as its victim impact statement.  That

letter included the following:

> Sentiment in town concerning what kind of sentence Karen should receive is mixed.  Some feel she made a mistake but should not be punished at all as her life is in ruins already.  Others feel she should get maximum jail time.  Most people who have spoken to us think she should get some jail time.  All felt she should be made to repay the Town for its financial losses, even though this realistically is probably not going to happen.  Several people mentioned that her "cooperation" with the forensic audit and investigation was self-serving considering that she appeared to have withheld computer passwords that delayed our getting the books in order by months.  One person was concerned if any townspeople lost their houses or had to move as a result of the higher taxes caused by her theft.

(*Id.* at ¶ 22f.)  Regarding that paragraph, Brisson filed the following objection that is

memorialized in the PSR:

> The defense understands that this paragraph is quoted from the actual victim impact statement provided by the town of Weybridge, Vermont, however, it is the defendant's position that she provided all of her computer passwords to the town for everything she had access to at the town clerk's office.  The defendant indicated that she does not understand why one or more of the passwords did not work.  Finally, Ms. Brisson stated that she cooperated by providing the passwords in a note to the town, and also provided a bank password to one of the town officials via text message.

(*Id.* at 20.)

## III.   Sentencing

Both parties filed sentencing memorandums prior to sentencing.  (Docs. 11, 12.)

In its memorandum, the government agreed with the PSR's guideline conclusions (Doc.

11 at 1) and argued for a 24-month term of imprisonment (*id.* at 3). Attorney McLaughlin filed a memorandum on Brisson's behalf, indicating that the defense had "no factual or legal objections to the PSR," but arguing for a variance from the guideline range and a term of imprisonment of only 12 months and one day. (Doc. 12 at 1, 9.) The defense's sentencing memorandum pointed out, among other things, that Brisson "confessed to her crime, after assisting the Town get through the November elections without disruption." (*Id.* at 4.) The memorandum also noted that Brisson had cooperated by giving the Town a mortgage on her home. (*Id.*) And the memorandum stated that Brisson had been diagnosed with depression and anxiety, "which she did not have at all until she dug herself into this mess." (*Id.* at 7.)

Brisson and Attorney McLaughlin appeared at the July 18, 2013 sentencing hearing. According to Brisson, she was "under severe duress" during the hearing and her "head was in a fog." (Doc. 17-2 at 1.) She says her mental state at that time was "not very good" and that she had a "difficult time focusing and listening." (*Id.*)

The court began by asking Brisson if she had read the PSR; she responded that she had. (Doc. 15 at 2:8–14.)[6] After noting and correcting a typo in the PSR,[7] the court separately asked Attorney McLaughlin, Brisson herself, and the government whether

---

[6] The sentencing transcript is also attached as an exhibit to the government's July 23, 2014 Opposition. (*See* Doc. 19-1.)

[7] The court noted that the Town of Weybridge's victim impact statement as recounted in the PSR included the following: "In addition to her embezzlement of $476,480.00, we are not discovering many areas in which certain things were required to be done under state and federal regulations that were either not done or done incorrectly." (PSR ¶ 22d.) The court noted that the Town's actual statement was that it was "*now* discovering" those additional problems. (Doc. 15 at 2–3.) That typo appears to play no role in Brisson's Motion, except to the extent that Brisson notes that the PSR contains several "irrelevant and harmless" errors. (Doc. 20 at 8.)

there were any other factual errors in the PSR; to which all responded no.  (*Id.* at 3:5–12.)
The court then stated that it would adopt the PSR (with the typo corrected) as its findings
of fact.  (*Id.* at 3:13–15.)

The parties indicated that they would call no witnesses, and the court accordingly
outlined for the parties how it would proceed with the remainder of the hearing.  (*Id.* at
3–4.)  Attorney McLaughlin began with his argument, and the court interrupted to inquire
about some of the material in the PSR that the court found surprising:

> Well, let me ask you about something because I thought this got
> presented as Miss Brisson heard about the embezzlement cases around
> Vermont and on her own felt so guilty about her misdeeds that she came
> forward and, you know, confessed without any hint that there was a
> problem and that's how this all came about.
>
> So I was surprised to see the chronology of events in the Pre-
> Sentence Report that it didn't unfold that way and that there had been an
> allegation of theft and that the Selectboard was proceeding with an audit
> and it was only when it really came down to the wire and the audit had been
> ordered that the confession became, you know, apparent.  And that there
> was a last check of $3,000 and change issued by Miss Brisson to herself in
> September of 2012 after all of this stuff had gotten moving.

(*Id.* at 5–6.)  Attorney McLaughlin responded as follows:

> [I]n terms of where the general understanding would come from as to the
> chronology we have certainly never represented to Your Honor, nor would
> we, that this came out of the blue where she's the one who simply stepped
> forward and said I embezzled and therefore let's deal with the
> consequences.  Because the chronology behind and detailed in the Pre-
> Sentence Report is accurate.  And as we, as self-evident from the fact that
> we're not objecting to it factually that is the chronology of events.
>
> What I would point out, Your Honor, is that in terms of the last
> check, which was identified by the Pre-Sentence Report, there's this period
> of time where Ms. Brisson tried to go ahead and resolve to make things
> better and resolve not to go forward.  And unfortunately, as you can see
> from the history of the amounts that she took and the frequency in which

she took, which started slow, and then ended up hitting full stride later on, she wasn't able to stop.  And she didn't stop.  And obviously we're here to get sentenced based on that.

(*Id.* at 6:13–7:7.)[8]

The court also noted surprise at the suggestion in the Town's victim impact statement (recounted in the PSR) that Brisson left the meeting with the auditor early, and was not fully cooperative in the forensic audit because she withheld certain computer passwords.  (Doc. 15 at 7–8.)  Attorney McLaughlin explained that Brisson's cutting out of the meeting was "only human" under the circumstances, and asserted that Brisson supplied all of the passwords that she had.  (*Id.* at 8.)  After Attorney McLaughlin's statement, the court invited Brisson to make a statement, which she did.  (*Id.* at 12–13.)

The government indicated that it did not have anything to add beyond what was stated in its sentencing memorandum.  (*Id.* at 14.)  The court asked the government for its perspective as to whether there was a lack of cooperation in the forensic audit.  (*Id.*)  The government described Brisson's significant help in reconstructing the fraud, but noted that there was some data that was unavailable to the auditors due to a lack of passwords. (*Id.* at 15–17.)  Still, the government could not say that the lack of passwords was because Brisson was withholding any passwords that she knew.  (*Id.* at 16–17.)

After hearing from the parties, the court proceeded to perform a guideline calculation, arriving at the same offense level, criminal history category, and resulting

---

[8]  Brisson now challenges McLaughlin's response as "tot[]ally false," "not at all what happened," "way off the mark," and "not the case at all."  (Doc. 23 at 2–3.)

guideline range as the PSR.  (*Id.* at 18–19.)  Considering the other factors set forth in 18

U.S.C. § 3553(a), the court stated as follows:

> In this case I found the following important: As you know we've had a number of embezzlement cases and they vary in terms of what the reason for the embezzlement is, how long it went on, how much money was involved, what was the person's position, were they a low-level employee, were they a high[-]level employee, how cooperative were they in the investigation, did they try to conceal their tracks and what were they doing with the rest of their life, were they an otherwise law abiding citizen.

> And you have what we would call aggravating and mitigating factors in both of those areas.  In the aggravating factors yours is one of the larger embezzlements that we've had, it went on for a longer period of time and you had a dual position of trust of being both the town clerk and the town treasurer.  And so you were the person the Town of Weybridge was looking to to be the fiduciary over their monies, make sure that they were collected and spent appropriately.  And that makes your case worse than some of the ones we see where somebody is a low-level bookkeeper in a company that receives federal funding for fuel assistance or something like that.

> Your behavior was more egregious as well.  The embezzlement started out slow, but it never consisted, at least from what I can read from the Pre-Sentence Report, of taking money, putting it back, taking money, putting a little bit less back, taking money, not really being able to put it back.  It was just taking money.  And it accelerated over time.

> And the chronology of events is pretty concerning because I believe what happened was the Town of Weybridge was hearing about all these embezzlement cases, they decided to think about doing their own audit, you were present for those conversations.  The Vermont League of Cities and Towns came to Weybridge and said, you know, you better do an audit.  And you were supportive of that.

> There was an allegation that you had committed a theft of eight to $9,000.  You were angry about that and wanted to know who had made the complaint.  And all of those things are happening and you are not saying, h[e]y, this is all true and it's a lot bigger than you think it is.

> And even when the audit was underway you were still in that resistance pattern.  And what I find incredible is cutting a check to yourself on September 4, 2012 when it's, it's clear that the audit is coming.  I don't

> know how much you cooperated thereafter.  It sounds like the government is satisfied enough with your level of cooperation that that's not a big factor, but I did read with interest that one perspective is that the cooperation was not complete.
>
> So in terms of embezzlement cases that have come before this Court yours is one of the more serious ones.  It lasted longer, it involved more money, it had more central position of trust.  And it continued right up until the time when it was clear that the embezzlement was going to get uncovered.  So the sentence needs to reflect it's a serious crime.

(*Id.* at 21–23.)  After discussing mitigating factors, the court remarked that "[i]n your case I think this is a case that would ordinarily be somewhere in the middle of the guidelines but for the other activities that you did in the community that were helpful to other people."  (*Id.* at 24:17–20.)  The court concluded that anything less than a bottom-of-the-guideline sentence would not "fully reflect the extent of the crime and the nature of abuse of trust," but that such a sentence was sufficient and not greater than necessary.  (*Id.* at 24–25.)

The court accordingly sentenced Brisson to 24 months, to be followed by a three-year term of supervised release with conditions.  (*Id.* at 25.)  The court advised the parties of their appeal rights, and specifically noted that "[i]f the defendant is unable to pay the cost of an appeal she has a right to apply for leave to appeal in forma pauperis in which event we would waive the cost of an appeal."  (*Id.* at 26–27.)  The court then took up a few remaining issues: recommendations as to where Brisson would serve her sentence, self-reporting, a money judgment, and priority of restitution.  (*Id.* at 27–32.)

## IV.   Brisson's Motion

Brisson filed her § 2255 Motion on June 13, 2014.  As noted above, she alleges

that that she was sentenced "based on factual errors."  (Doc. 17-2 at 1.)  In her

Supplemental Memorandum, Brisson confirmed that she is asserting an ineffective-

assistance-of-counsel claim.  (*See* Doc. 23 at 3.)[9]  Brisson also requests that she be

transferred to a facility closer to Vermont, or that she be permitted to serve the remainder

of her incarcerative sentence under home detention.  (Doc. 17-3 at 3.)

Discussion

## I.   Section 2255 Motion; Procedural Default

Under 28 U.S.C. § 2255, a federal prisoner may collaterally attack her sentence

"upon the ground that the sentence was imposed in violation of the Constitution or laws

of the United States."  However, "[i]n general, a defendant is barred from collaterally

challenging a conviction under § 2255 on a ground that [s]he failed to raise on direct

appeal."  *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011).  Here, Brisson failed

to bring any direct appeal; her claim that she was sentenced based on factual errors is

therefore procedurally defaulted unless she can establish "(1) cause for the procedural

default and ensuing prejudice or (2) actual innocence."  *Id.*

Here, Brisson does not assert actual innocence; in fact she has stated that she

accepts responsibility for her crime.  (Doc. 17-2 at 1.)  As for "cause," Brisson would

have to show "external" circumstances—something that could not be "fairly attributed"

---

[9]  Additional factual background regarding Attorney McLaughlin's conduct is set forth as necessary below.

to her. *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) (internal quotation marks omitted). The only argument that Brisson could potentially make to show cause would be an argument of ineffective assistance of counsel. *See United States v. Hill*, No. 2:12 CR 12-4, 2014 WL 4443272, at *4 (D. Vt. Sept. 9, 2014) (proceeding to analyze ineffective-assistance claim as containing otherwise procedurally barred claims); *United States v. Turner*, No. 2:03 CR 147, 2009 WL 396063, at *2 (D. Vt. Feb. 17, 2009) (same); *Familia-Garcia v. United States*, No. 95 CIV. 6284 (PKL), S2 89 CR. 398 (PKL), 1996 WL 706938, at *2 (S.D.N.Y. Dec. 9, 1996) ("The only argument that petitioner can possibly make to show cause would be an argument of ineffective assistance of counsel."). An ineffective-assistance-of-counsel claim can be brought regardless of whether it was raised on appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Amiel v. United States*, 209 F.3d 195, 198 (2d Cir. 2000).

## II.     Standards Governing Ineffective-Assistance-of-Counsel Claims

Brisson has a right under the Sixth Amendment to effective assistance from her attorney at all critical stages of the proceedings, including sentencing. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). In order to succeed on her ineffective-assistance-of-counsel claim, Brisson must meet the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced her defense. *Id.* To satisfy the first prong, Brisson must show that Attorney McLaughlin's performance "fell below an objective standard of reasonableness in light of prevailing professional norms." *Jackson v. Conway*, 763 F.3d 115, 152 (2d Cir. 2014) (internal quotation marks omitted).

Counsel's performance need not be perfect; "attorneys are deficient only if they fall below a standard of 'reasonably effective assistance.'"  *Whitley v. Ercole*, 965 F. Supp. 2d 344, 351 (S.D.N.Y. 2013) (quoting *Strickland*, 466 U.S. at 687); *see also Kohler v. Kelly*, 890 F. Supp. 207, 214 (W.D.N.Y. 1994) ("[T]he right to meaningful representation does not include the right to a flawless performance.").  To satisfy the second prong, Brisson "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Jackson*, 763 F.3d at 153 (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

## III.    Brisson's Ineffective-Assistance-of-Counsel Claims

As the court previously noted (Doc. 24 at 1–2), Brisson asserts that Attorney McLaughlin: (1) failed to file an appeal despite her request, and advised her that "the B.O.P. frowned on [appeals] so his advice would be to let it go and not appeal"; (2) failed to advise her of her right to be represented by an attorney during an appeal regardless of her ability to pay; (3) failed to conduct an adequate investigation of her case, and did not make reasonable efforts to understand the case; (4) did not properly investigate the case despite being aware of mental health issues; (5) failed to object to or correct false information presented at sentencing; (6) failed to advise her properly about the presentence investigation; and (7) failed to argue that she attempted to make restitution before she was formally indicted.  (*See* Doc. 23 at 2–3.)  I combine some of those claims together for the purposes of the discussion that follows.

### A.    Performance Prong

#### 1.    Alleged Failure to Give Advice About the PSR

Brisson asserts that she was "not properly advised about the information in the [PSR]."  (Doc. 20 at 7; *see also* Doc. 23 at 3.)  She says that she "did not understand its preciseness and criticalness" and that she "didn[']t know I was to refute it."  (Doc. 20 at 7.)  Attorney McLaughlin states that he reviewed the PSR with Brisson at his office on June 19, 2013, the day after it was received.  (Doc. 25 at 8.)  He further states that he had Brisson take a copy of the PSR with her for further review, that Brisson received the final PSR and that, after being asked whether there were any factual errors, had no significant objections to its accuracy.  (*Id.*; *see also* Doc. 25-8.)  Brisson replies that she agrees that McLaughlin had her review the PSR, but says that she is "just stating I did not fully understand it[]s use and that I wasn[']t in the greatest shape to review it."  (Doc. 27 at 5.)

The PSR has been described as "the single most important document at sentencing."  *United States v. Molina*, 356 F.3d 269, 273 (2d Cir. 2004) (internal quotation marks omitted).  That said, Brisson does not dispute the facts regarding Attorney McLaughlin's efforts to review the PSR with her, to make the PSR available for her review, and to elicit her position as to the PSR's factual accuracy.  She also does not allege that she told McLaughlin that she was having trouble understanding what the PSR was, how it would be used, or what she was being asked to do with it.[10]  In fact, Brisson

---

[10]  Notably, Chief Judge Reiss explained each of those things at the March 25, 2013 hearing. Judge Reiss described the PSR as a comprehensive document that would be used to help the judge determine the appropriate sentence, and that Brisson would have an opportunity to challenge the facts in the PSR before it was submitted to the court.

ultimately concedes that she was at fault for not recognizing the errors that she now alleges appear in the PSR.  (*See* Doc. 27 at 4.)

Brisson does state that McLaughlin knew she was a "total mess" and "barely functioning."  (*Id.*)  However, such a general assertion cannot support a conclusion that McLaughlin's counseling regarding the PSR was constitutionally deficient, nor does Brisson say what more he should have done.  Indeed, McLaughlin has testified that he was aware of Brisson's depression issues and that those issues "never interfered with her ability to communicate fully and effectively with me in preparing her defense."  (Doc. 25 at 5.)  In any event, even if McLaughlin's performance with respect to the PSR was somehow deficient resulting in factual errors in the PSR, Brisson was not prejudiced for the reasons discussed below.

## 2.     Alleged Failures to Investigate, Understand, or Present Facts

Brisson claims that Attorney McLaughlin failed to investigate or understand her case.  As the Supreme Court explained in *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  466 U.S. at 691.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Id.*  "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."  *Id.*

Here, Brisson never advised McLaughlin of any factual errors in the PSR despite having multiple opportunities to review it.  Neither does Brisson allege that in any of her other conversations with McLaughlin she supplied information that might have indicated

factual errors in the PSR.  Under those circumstances, Attorney McLaughlin could reasonably conclude that there was no need to engage in any more investigation than had already been done.  For the reasons stated above, there is no merit to Brisson's claim that McLaughlin's knowledge of her mental health issues should have caused him to take some additional action.  According McLaughlin the "heavy measure of deference" his judgments are due, *id.*, it was reasonable for him to refrain from launching an additional investigation into the chronology of events.

If Attorney McLaughlin failed in any respect regarding the PSR, it might have been a failure to recognize (or point out to the court) that the PSR's chronology contained some ambiguities about the precise dates of certain events.  Specifically, the PSR did not supply the actual date that the Selectboard discussed the VLCT's audit recommendation or whether that discussion occurred before or after Brisson's final act of embezzlement on September 4, 2012.  The PSR also did not indicate whether the "early September" allegation of theft occurred before or after September 4, 2012.

With the benefit of hindsight, those ambiguities are now apparent.  However, the *Strickland* test requires the court to attempt to "eliminate the distorting effects of hindsight" and to "evaluate the conduct from counsel's perspective at the time."  *Jackson*, 763 F.3d at 153 (internal quotation marks omitted).  Here, the PSR was not organized around the September 4, 2012 date; the narrative does not even mention that date until well after describing Brisson's admission in November 2012.  (*See* PSR ¶ 15d.)  To the extent Attorney McLaughlin neglected to notice or highlight the ambiguities, that apparent oversight does not rise to the level of constitutionally deficient performance.  At

17

best, Brisson's claim is that McLaughlin's performance was not flawless; that is an insufficient basis to conclude that she received constitutionally defective representation. Moreover, as discussed below, Brisson was not prejudiced.

Attorney McLaughin's statements in response to the court's questions about the chronology were not deficient. As recounted above, the court inquired about whether Brisson had confessed before there was any hint of a problem, or whether instead she only confessed after there was an allegation of theft and it was clear that the embezzlement would be uncovered. The court also inquired whether Brisson had issued herself a check in "September of 2012 after all of this stuff had gotten moving." (Doc. 15 at 6.) Brisson asserts that Attorney McLaughlin's response (set forth in full above) was "tot[]ally false." (Doc. 23 at 2.) McLaughlin maintains that his response was accurate. (Doc. 25 at 7.)

McLaughlin's response to the court's question about the timing of Brisson's confession was that the defense was not arguing that Brisson confessed responsibility for embezzling "out of the blue." (Doc. 15 at 6:16.) Attorney McLaughlin's response was not incorrect, let alone constitutionally deficient. Even under the chronology of events that Brisson now advances, she did not actually confess her embezzlement until after there was an allegation of theft and the audit was underway.

McLaughlin's response to the court's question about the September 4, 2012 check was that there was a "period of time where Ms. Brisson tried to go ahead and resolve to make things better and resolve not to go forward" and that Brisson "wasn't able to stop" her embezzlement. (*Id.* at 6:25–7:6.) In his affidavit, McLaughlin says that "it was

absolutely correct that Ms. Brisson[] continued to embezzle up through early September 2012. As I stated to the Court, she was not able to stop." (Doc. 25 at 7.) Again, there is nothing incorrect about that answer even under Brisson's version of events.

Neither of Attorney McLaughlin's answers to the court's questions about the timing of Brisson's confession or the September 4, 2012 check included specific dates. McLaughlin's answers therefore, while not incorrect, did not resolve the ambiguities in the PSR's chronology noted above. As discussed above, any such failing does not rise to the constitutional level. In any case, Brisson is still not entitled to relief because she cannot show prejudice. *See infra*.

Brisson also asserts that McLaughlin should have presented the correct facts as to why she stayed working as long as she did: according to Brisson, she was not in "resistance mode," but was instead acting in the best interest of the Town to see it through the November 2012 elections. (Doc. 23 at 3.) However, Attorney McLaughlin points out that he did inform the court about Brisson's motivation to get the Town through the elections. (*See* Doc. 25 at 8 ("As set forth in my Sentencing Memo, I told the Court that she confessed to her crime, 'after assisting the Town get through the November elections.' Memo at 4. I also mentioned this at sentencing, that revealing the embezzlement would have caused a stir vis-à-vis the November elections, and Ms. Brisson was trying to get through that piece.").) There is no basis for Brisson's claim on this point.

Finally, Brisson asserts that McLaughlin should have pointed out that she offered the Town a mortgage on her home when she first admitted her wrongdoing; according to

Brisson that shows her efforts to make restitution even before her indictment, and should have earned her some additional credit.  (Doc. 23 at 3.)  McLaughlin states that he "accurately portrayed all of the facts regarding pre-charge restitution."  (Doc. 25 at 9.) Specifically, Attorney McLaughlin notes that his sentencing memorandum advised the court that Brisson had given a mortgage on her home, and that he had emphasized that effort at the sentencing hearing.  (*Id.*)  The record indisputably supports Attorney McLaughlin on that point.

### 3.    Alleged Failures Regarding Appeal

Brisson asserts that Attorney McLaughlin's performance regarding her appeal rights was deficient in a variety of respects.  She contends that McLaughlin failed to file an appeal despite her request, advised her that "the B.O.P. frowned on [appeals] so his advice would be to let it go and not appeal," and failed to advise her of her right to be represented by an attorney during an appeal regardless of her ability to pay.  (Doc. 23 at 2–3.)  For his part, McLaughlin states that he and Attorney Peter Langrock met with Brisson on July 30, 2013.  (Doc. 25 at 3.)  McLaughlin does not recall saying anything along the lines of the BOP frowning on appeals, and asserts that he would not have made such a statement because it is not true.  (*Id.*)

Attorney McLaughlin also states that he doubts the issue of Brisson's right to an appointed appellate attorney came up "for the simple reason that Ms. Brisson was not paying us out-of-pocket at that time, and therefore there was no concern about her ability to fund the appeal."  (*Id.* at 4.)  McLaughlin states that his firm's "expectation of payment was based on the mortgage interest Ms. Brisson had granted us in her home" and that

there was "sufficient security to fund an appeal" and "no concern expressed by anyone at our July 30 meeting about Miss Brisson's inability to afford an appeal." (*Id.*)

Finally, McLaughlin insists that it is "absolutely false" that he failed to file an appeal despite Brisson's request. (*Id.* at 3.) McLaughlin states that he met with Brisson and discussed taking an appeal, but expressed his opinion that an appeal "had effectively no chance of success." (*Id.*) McLaughlin says he explained to Brisson that an appeal would be unlikely to succeed "because she had received a bottom end of the guidelines range sentence, and because there were multiple aggravating factors relied upon by Judge Reiss which would support such a sentence, even if she had made the factual mistake claimed by Ms. Brisson." (*Id.*) According to McLaughlin, Brisson "indicated that she understood she had the right to direct us to file a notice of appeal for her, but was choosing not to based on my advice that it had effectively no chance of being successful." (*Id.*)

Brisson agrees that McLaughlin "talked me out of filing an appeal." (Doc. 27 at 3.)[11] She maintains, however, that:

> 1) McLaughlin stated that he wasn[']t sure about what he recalled about what the Judge stated about the last check (which the transcript later confirmed)[;] 2) that an appeal had no chance of success[;] 3) either he or his partner said "The BOP frowns upon appeals and I would get different treatment in prison"[;] 4) either he or his partner said it[']s very expensive (that was the extent of the discussion regarding expense).

---

[11] Because Brisson concedes that McLaughlin convinced her not to appeal, there is no basis for pursuing production of emails that Brisson says would show "how adamant I was that I wanted to pursue an appeal." (*Id.*)

(*Id.*)  Brisson insists that she "defin[i]tely would have appealed if he hadn[']t talked me out of it and advised me against it."  (*Id.*)

The *Strickland* standard applies to ineffective-assistance claims "in connection with the failure of trial counsel to pursue an appeal."  *Garcia v. United States*, 278 F.3d 134, 137 (2d Cir. 2002).  "A lawyer who disregards a defendant's specific instructions to file an appeal acts in a manner that is professionally unreasonable."  *Id.*  "The petitioner has also shown prejudice when [she] shows that [she] would have taken an appeal, such as when [she] asked [her] counsel to file the appeal; [she] need not make a showing of the merits of the appeal."  *Id.*  Here, there is no question that Brisson was advised of and knew her appellate rights, consulted with counsel regarding appeal, and decided not to file an appeal based on McLaughlin's advice.  Brisson's claim is really that McLaughlin advised her not to appeal for improper reasons.

Brisson's assertion regarding the alleged mention of the cost of appeal does not establish constitutionally deficient performance.  Assuming that there was a mention of the cost of appeal, it is certainly a proper topic of discussion when a private attorney is retained.  There is no suggestion that counsel advised Brisson that her only possible route to appeal was to continue employing McLaughlin's firm.  To the contrary, the court had specifically advised her of her right to apply for leave to appeal in forma pauperis if she was unable to pay.  (Doc. 15 at 26–27.)

Regarding the alleged remarks that the BOP frowns on appeals and that Brisson would get different treatment in prison if she appealed, the court should exercise its discretion and resolve the claim without an evidentiary hearing.  Brisson has expressed

her position at length in multiple filings; her testimony "would add little or nothing to the written submissions." *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001).  Brisson bears the burden of proving her claim, and her assertion on this point is not only improbable but fanciful.  Attorney McLaughlin has credibly stated in a sworn affidavit that he does not recall making the alleged statement, and that he would not have done so because it is not true.[12]  (Doc. 25 at 3.)  A hearing would not offer any reasonable chance of altering that conclusion.  *See Chang*, 250 F.3d at 86.

The remainder of Brisson's claim regarding McLaughlin's advice is her challenge to McLaughlin's conclusion that any appeal would not be successful.  Notably, McLaughlin states in his affidavit that that was his conclusion even assuming that the court was mistaken about the chronology as Brisson alleges.  Therefore it was not unreasonable for McLaughlin to give his opinion even without reviewing the sentencing transcript.  As McLaughlin explains, he concluded that any appeal would not be successful because Brisson "had received a bottom end of the guidelines range sentence, and because there were multiple aggravating factors relied upon by Judge Reiss which would support such a sentence, even if she had made the factual mistake claimed by Ms. Brisson."  (Doc. 25 at 3.)  That advice was reasonable, and is also consistent with the analysis below regarding prejudice.

---

[12]  It also bears noting that it is highly improbable that experienced federal criminal practitioners such as attorneys McLaughlin and Langrock would advise a client that the Bureau of Prisons "frowned on" direct appeals.

### 4.       Cooperation

As recounted in the PSR, the Town of Weybridge's victim impact statement included a suggestion that Brisson might have withheld some computer passwords.  At sentencing, the court remarked that "[i]t sounds like the government is satisfied enough with your level of cooperation that that's not a big factor, but I did read with interest that one perspective is that the cooperation was not complete."  (Doc. 15 at 22:24–23:3.)  It is unclear whether Brisson is alleging that Attorney McLaughlin's performance with respect to the issue of cooperation was deficient.  At least Brisson's original pleading lists the password issue among the alleged errors at sentencing.  (*See* Doc. 17-2 at 2 ("I had numerous quickbooks over the years and gave them all passwords I had.").)

Any claim of ineffectiveness surrounding the password issue has no merit.  First, Attorney McLaughlin supplied an objection to the suggestion in the PSR that Brisson might have withheld passwords.  (PSR at 20.)  He also made a similar objection at the sentencing hearing.  (*See* Doc. 15 at 8.)  As to prejudice—which is discussed more fully below regarding Brisson's other claims—it appears that the password issue played little to no role in the court's sentencing decision; the court explicitly remarked that it appeared the government was satisfied with Brisson's cooperation, and that the issue of cooperation was "not a big factor."  (*Id.* at 23:1.)

## B.   Prejudice Prong

Even assuming that McLaughlin's performance at sentencing was deficient,[13] Brisson cannot prove that any such failures prejudiced her defense.  Chief Judge Reiss considered a variety of circumstances in the course of evaluating the aggravating and mitigating factors in Brisson's case:

> what the reason for the embezzlement is, how long it went on, how much money was involved, what was the person's position, were they a low-level employee, were they a high[-]level employee, how cooperative were they in the investigation, did they try to conceal their tracks and what were they doing with the rest of their life, were they an otherwise law abiding citizen.

(Doc. 15 at 21:7–13.)  Brisson does not dispute any of the facts supporting the court's conclusions with respect to amount or duration of embezzlement, Brisson's position of trust in the Town, and the specific conduct of taking more and more money without putting any back.

The combination of those circumstances—even without addressing the additional circumstances that Brisson challenges—would be sufficient to warrant the 24-month sentence (even in light of the mitigating factors).  Determining whether the court would have granted a non-Guidelines sentence under Brisson's version of events would be entirely speculative, especially in light of the "considerable discretion" the court has in deciding whether to grant a variance.  *United States v. Wernick*, 691 F.3d 108, 118 (2d Cir. 2012).

---

[13]  For all of the reasons discussed above, McLaughlin's performance was not deficient. Moreover, as Attorney McLaughlin points out, he was successful in negotiating the amount of loss down to $400,000, resulting in a substantially reduced guidelines range.  (*See* Doc. 25 at 1.)  That constitutes strong evidence of *effective* lawyering.

In any case, Brisson's challenges to the court's additional findings of aggravating factors are insufficient to prove prejudice. Her § 2255 Motion raises two basic challenges to the chronology in the PSR: (1) that the date of the Selectboard's discussion of the VLCT's audit recommendation was mid-September instead of August—i.e., after the September 4, 2012 check; and (2) that no allegation of embezzlement was made against her until *after* she had written the September 4, 2012 check.[14] As discussed above, the PSR's chronology is ambiguous regarding those two events. However, as described below, the court's sentencing decision did not depend on the precise dates of those events, and thus Brisson cannot prove prejudice arising out of any failure by Attorney McLaughlin with respect to them.

### 1.    "Resistance Pattern"

Brisson maintains that the court incorrectly concluded that she was in "resistance mode" because the court was not advised that the Selectboard discussed the VLCT's recommendation in mid-September rather than in August. (*See* Doc. 27 at 4.) However, the "resistance pattern" that the court was discussing appears from the context of the discussion to be Brisson's failure to confess earlier than she did. (*See* Doc. 15 at 22:8–21 (after discussion of Brisson's failure to confess despite various events, court remarked that "even when the audit was underway you were still in *that* resistance pattern" (emphasis added)).) Whether the Selectboard's discussion of the VLCT's recommendation occurred in August or mid-September has no bearing on that issue,

---

[14] The other factual errors in the PSR that Brisson alleges—such as whether the Selectboard's very first discussion about an audit occurred in March or May 2012, and whether Brisson was advised of the allegation against her on a Monday or a Friday—are not material.

since it remains true that Brisson did not confess her embezzlement at the time the
Selectboard discussed the VLCT's recommendation; in fact her confession was not
communicated to the Town until November 12, 2012.

### 2.      September 4, 2012 Check

Chief Judge Reiss explicitly mentioned the September 4, 2012 check twice at
Brisson's sentencing.  The first mention was in the court's question to Attorney
McLaughlin about the chronology of events, where the court inquired about the check
that Brisson issued to herself "in September of 2012 after all of this stuff had gotten
moving."  (Doc. 15 at 6:7–8.)  The second mention was the court's statement that "what I
find incredible is cutting a check to yourself on September 4, 2012 when it's, it's clear
that the audit is coming."  (*Id.* at 22:21–23.)  The court also implicitly mentioned the
September 4, 2012 check in its conclusion regarding the aggravating factors in Brisson's
case, remarking that the embezzlement "continued right up until the time when it was
clear that the embezzlement was going to get uncovered."  (*Id.* at 23:7–9.)

Here, the dates of the Selectboard's discussion of the VLCT's audit
recommendation, and of the first allegation of theft against Brisson, are arguably
implicated.  Under Brisson's version, the only material events that occurred prior to
September 4, 2012 are: (1) the Selectboard's initial discussion about the possibility of an
audit (and tabling that issue) after one Selectboard member read some general news
stories related to embezzlement, and (2) the VLCT's recommendation to towns that they
conduct external audits.  According to Brisson, the Selectboard's discussion of the

VLCT's recommendation, and the complaint that Brisson had taken $8,000 to $9,000 from the Town, both occurred *after* September 4, 2012.[15]

However, even assuming that Brisson's chronology is correct, the court's conclusions are still sufficiently supported, and the probability of a different result is slight at best, and certainly not enough to undermine confidence in the outcome.  The court's impression that Brisson had issued herself a check "after all of this stuff had gotten moving" is still accurate, since both the early discussion about an audit and the VLCT's recommendation can fairly be considered the beginning of the stream of events that ultimately led to the discovery of Brisson's embezzlement.  Moreover, the court's findings that, by September 4, 2012, it was "clear that the audit is coming" and that "the embezzlement was going to get uncovered" are also still supported.  By that date, even under Brisson's chronology, the Selectboard had contemplated an audit earlier in the year, and the VLCT had very recently recommended that all Vermont towns conduct external audits.  Even if the Selectboard had not yet discussed the VLCT recommendation, and even if it had not yet heard the complaint against Brisson, it was still fair to conclude that an audit would be coming and that the embezzlement would be uncovered.

---

[15]  Attorney McLaughlin maintains that the Selectboard's discussion of the VLCT's recommendation occurred in August, before the September 4, 2012 check.  (*See* Doc. 25 at 6, 7–9.) McLaughlin apparently agrees with Brisson that the complaint of theft reported to the Selectboard came after the final check.  (*See id.* at 7.)

## IV.    Brisson's Request for Home Detention or Transfer

Included with Brisson's Motion is a request that she be permitted to "serve the second part of my sentence under home detention or a facility that I could work closer to home." (Doc. 17-3 at 3.)  She asserts that her incarceration in West Virginia—where she is currently serving her sentence—is having a number of negative impacts, including: (1) it is making it difficult for her to save her home from foreclosure (and thus use proceeds from any sale to pay restitution), and (2) because she is so far from home, she is not able to have visits from friends and family. (*See* Doc. 17-3 at 2–3.)  Brisson's request, however, is not cognizable under § 2255 since it does not challenge her conviction.

## V.    No Hearing is Required

In ruling on a § 2255 motion, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see Pham v. United States*, 317 F.3d 178, 185 (2d Cir. 2003) (section 2255 does not permit summary dismissals of motions that present facially valid claims).  However, § 2255 does not entitle the defendant to a hearing where her allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *see Chang*, 250 F.3d at 85.  To warrant a hearing, the defendant's motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle her to relief. *See Machibroda*, 368 U.S. at 494; *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987).  Brisson has failed to show specific facts

that if proved at a hearing would warrant the granting of her Motion.  Accordingly, no

hearing is required.

### Conclusion

Accordingly, I recommend that Brisson's Motion Under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct a Sentence (Doc. 17) be DENIED.

Dated at Burlington, in the District of Vermont, this 25th day of November, 2014.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).
Failure to timely file such objections "operates as a waiver of any further judicial review
of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15,
16 (2d Cir. 1989).